Frank J. Saxe, as Surviving Partner, Appellant, *v.* Penokee Lumber Company, Respondent.

1. Contract of Sale — Breach by Vendor — Measure of Damages. The general rule for the measure of damages, where the vendee sues the vendor for the breach of a contract of sale of merchandise at a fixed price, is the difference between the contract price and the market value at the time and place of delivery; and when the vendee can go into the market and buy the article which the vendor has failed to deliver, this is the only rule.

2. Rule as to Duty of Party Injured by Breach of Contract, to Mitigate Damages. The rule that the party who suffers from a breach of contract must so act as to make his damages as small as he reasonably can, is without practical application to a case where the subject-matter of the contract has a market value at the time and place of delivery.

3. Buying in Market not Essential to Securing Actual Damages. The law does not require the vendee to go into the market and buy, in order to secure the damages actually sustained by him through a breach, on the part of the vendor, of a contract for the sale of an article having a market value.

4. Action for Vendor's Breach of Contract — Damages Measured by Market Value — Immaterial Evidence Sought to be Introduced by Vendor. On the trial of an action for damages for the vendor's breach of a contract of sale of an article of merchandise, such as lumber of a particular kind and quality, which was in the market and had a market value at the time and place of delivery, questions on the part of the vendor to one of his witnesses, not tending to elicit proof of open market value, and apparently based upon the theory that the vendee was obliged to look about for lumber to take the place of that which the vendor had refused to deliver, instead of relying upon the market value of the lumber at the time and place of delivery as and for his indemnity, are properly excluded as immaterial.

*Saxe* v. *Penokee Lumber Co.,* 11 App. Div. 291, reversed.

(Argued May 2, 1899; decided June 6, 1899.)

Appeal from an order of the Appellate Division of the Supreme Court in the third judicial department, entered December 16, 1896, reversing a judgment in favor of plaintiff entered upon the report of a referee and granting a new trial.

This action was brought to recover damages for an alleged breach of contract for the sale of lumber.

The referee's findings of fact were not reversed by the

Appellate Division, and with the exception of the formal findings touching incorporation, dissolution of partnership, etc., they are as follows :

Between the 31st day of January and the 7th day of February, 1890, the plaintiff and the defendant entered into a contract in writing by which the defendant agreed to sell and deliver to the plaintiff four million feet of lumber at $28.50 per thousand feet.

The lumber so agreed to be sold and delivered was known in the trade as No. 2 cutting up and better, and the same was to be sawn from logs the defendant was then getting out in Ashland county, Wisconsin, and to be sawn at the mills of said defendant at Morse Station, Ashland county, Wisconsin, in dimensions as directed by plaintiff to be made in quantities of different thicknesses in the proportion and the amount of about 666,666 feet of one inch thick, 2,666,666 feet of one and one-quarter and one and one-half inches thick, and 666,666 feet two inches thick and better.

The plaintiff agreed to accept such lumber and to pay to defendant therefor $28.50 per thousand feet, and plaintiff further agreed to pay to the defendant as an advance upon said purchase price the sum of $40,000.

All of said lumber was to be delivered at Tonawanda, free on board canal boats, to the plaintiff before October 1, 1890.

It was further agreed that in the event that the defendant delivered any of the lumber under said contract after the 1st day of October, 1890, the defendant was to pay such canal freights on any balance which was delivered after that date as might be in excess of the average rate of canal freights paid on the lumber delivered during the month of September ; but it was agreed that all said lumber should be delivered before the close of canal navigation for the season of 1890.

The plaintiff paid to defendant the sum of $40,000 as advances upon the purchase price of said lumber, as required by the contract, and the defendant undertook to deliver the lumber required under said contract, and in all delivered 2,791,100 feet.

The amount of lumber which the defendant failed to deliver to the plaintiff under the contract, and which the defendant was bound to deliver, amounted to 1,208,900 feet, which balance is referred to as "shortage" on said contract, and the shortage of the different thicknesses aforesaid was as follows : 85,160 feet of one inch, 781,950 feet of one and one-quarter and one and one-half inch, 341,790 feet of two inch and thicker, making a total shortage of 1,208,900 feet.

During the delivery of said lumber under the contract some questions arose between the plaintiff and defendant as to the inspection of said lumber, and in order to make the inspection come up to the requirements of the contract the Penokee Lumber Company, the defendant, on the 5th day of September, 1890, allowed the plaintiff the sum of $2,357.00, and reduced the price of the lumber to be thereafter delivered under said contract one dollar per thousand feet, making the price on all lumber thereafter to be delivered $27.50 per thousand feet, instead of $28.50.

The acceptance by the plaintiff of this proposition was not to affect the terms of the original contract, and the Penokee Lumber Company agreed that subsequent shipments of lumber would be as good as last shipment.

The several grades of lumber above the grade of No. 2 cutting up are as follows : "Uppers," "selects" and "fine common," and the lumber agreed to be delivered under said contract was the product of the Penokee Lumber Company and was known in the trade as Penokee lumber, and the Penokee lumber of that season and the year before was a superior grade and quality of pine.

By the terms of the contract made between the parties the defendant agreed to sell and deliver to the plaintiff Penokee lumber, and the plaintiff agreed to purchase and pay for Penokee lumber and no other.

On the 31st day of October, 1890, the defendant notified the plaintiff that it would be unable to complete the contract with the plaintiff and that they would probably be short 1,200,000 feet, and the defendant stated to the plaintiff that it

would be necessary either to have the contract canceled or have plaintiff give defendant permission to furnish the balance early next season, and plaintiff declined to do either, and defendant did not withdraw such notice.

The reason why the defendant was unable to fulfill its contract was because it had made from the lumber it was procuring " board pine," during the previous winter, and it had underestimated the effect that such manufacture would have on the quantity of lumber it was under contract to furnish this plaintiff, and because of defendant shutting down its mills earlier than usual on account of failure to get workmen.

The Penokee Lumber Company in the month of September, 1890, during the delivery of the lumber under said contract, stated to plaintiff that the average market value per thousand feet of the lumber they were then delivering under the contract at Tonawanda, N. Y., was at least $32.50 per thousand feet, and guaranteed that all shipments thereafter would show an average valuation at Tonawanda of $32.50, and that this was the lumber that plaintiff was getting under this contract at $27.50 per thousand feet.

The defendant stated to plaintiff, October 2d, 1890, that the lumber it was then delivering under the contract showed an average value of $32.50 per thousand feet, and in fact the market value of the lumber defendant agreed to deliver to plaintiff under the contract was at Tonawanda, in the fall of 1890, $32.50 per thousand feet.

The plaintiff, in addition to paying to defendant the full amount of the advances agreed to be paid under the contract, paid to it also the agreed contract price for all lumber delivered by defendant under the same, but defendant on the 24th day of November, 1890, returned to plaintiff the sum of $146.39, being the final payment made by plaintiff on account of the contract price of the lumber so delivered to plaintiff.

The plaintiff accepted all lumber of the grade, quality and character required by the contract, delivered by defendant to plaintiff during the season of 1890. The Erie canal closed for navigation on the 30th day of November, 1890. The plaintiff

always held himself ready to receive the lumber contracted to be delivered, if defendant would deliver the same during the open canal season of 1890, notwithstanding the defendant had failed to deliver the same prior to October 1, 1890, and the plaintiff so stated to defendant, even after defendant had notified plaintiff that it was unable to fulfill the contract.

Pine lumber, the product of different mills, has different characteristics and the product of no two mills is exactly alike.

Penokee lumber, so called, the product of the mills of the Penokee Lumber Company, in the season of 1889 and the season of 1890, was a superior pine lumber and had a ready sale in the market.

*Hamilton Harris* for appellant. The court below erred in reversing the judgment of the referee and granting a new trial. (*Newell* v. *Doty*, 33 N. Y. 83; *Waugh* v. *Fielding*, 48 N. Y. 681; *People* v. *Sharp*, 107 N. Y. 427; *Parsons* v. *Sutton*, 66 N. Y. 92; *Todd* v. *Gamble*, 148 N. Y. 382.) The measure of damages sustained by the plaintiff by reason of the failure to perform the contract by delivering the lumber as required, was the difference between the contract price and the market price or value at the time and place of delivery. (2 Sedg. on Dam. [8th ed.] §§ 734, 735; *Marsh* v. *McPherson*, 105 U. S. 709; *Dana* v. *Fiedler*, 12 N. Y. 40; *Windmuller* v. *Pope*, 107 N. Y. 674; *Taylor* v. *Saxe*, 134 N. Y. 67; *Todd* v. *Gamble*, 148 N. Y. 382.) The defendant's announcement that it would be unable to execute the contract as agreed, coupled with the giving of reasons for such failure, was a full and complete rescission, and justified the plaintiff in considering that from that time the defendant was in default. (*Nichols* v. *S. S. Co.*, 137 N. Y. 486; *Flaherty* v. *Miner*, 123 N. Y. 382.) The plaintiff does not seek to recover remote damages nor any which could have been avoided, but asks only those which directly followed the act of the defendant in violation of the contract. The referee found only such damages, and the finding should be sustained. (*Leonard* v.

*N. Y. A., etc., Tel. Co.*, 41 N. Y. 544; *Griffin* v. *Colver*, 16 N. Y. 494.) The burden of proof is always on defendant to prove that the plaintiff might have reduced damages. (*Hamilton* v. *McPherson*, 28 N. Y. 72; *Hopkins* v. *Sandford*, 41 Mich. 243.) The plaintiff was justified in assuming that the contract was broken immediately by the declaration of defendant that it could not perform. (*Nichols* v. *S. S. Co.*, 137 N. Y. 471.

*Henry H. Seymour* for respondent. The plaintiff did not fulfill the contract upon his part. He violated a condition precedent while the contract was still in force by not remitting $3,700 on November 19, 1890. (*Shaw* v. *R. L. Ins. Co.*, 69 N. Y. 286; Code Civ. Pro. § 533; *Oakley* v. *Morton*, 11 N. Y. 25; *Nichols* v. *S. S. Co.*, 137 N. Y. 471; *Quarles* v. *George*, 23 Pick. 400; *Wharton* v. *Winch*, 140 N. Y. 287.) Plaintiff should have only nominal damages. (*R. L. Co.* v. *S. & P. P. Co.*, 135 N. Y. 209; *Parsons* v. *Sutton*, 66 N. Y. 92.)

PARKER, Ch. J. The Appellate Division rested its reversal of the judgment entered upon the report of the referee upon exceptions taken to the refusal of the referee to permit two questions to be answered. Unless that court rightly determined that it was error not to allow the questions to be answered, its order of reversal is without support on this review. The findings of fact made by the referee are unreversed, and are controlling here, and fully support the judgment rendered. They show that the plaintiff and the defendant entered into a contract by which the defendant agreed to deliver to the plaintiff 4,000,000 feet of lumber, known in the trade as No. 2 cutting up and better, and that the same was to be sawn from logs the defendant was then getting out in Ashland county, Wisconsin, and to be sawn at the mills of said defendant at Morse Station, in dimensions as directed by the plaintiff, at $28.50 per thousand feet; said deliveries to be F. O. B. in canal boat at Tonawanda, and all completed before Oct. 1st,

1890; that the defendant failed to keep and perform its contract in that it delivered only 2,791,100 feet, leaving undelivered 1,208,900 feet, and that the market value of the lumber that the defendant agreed to deliver to the plaintiff under the contract was, at the time and place of delivery, $32.50 per thousand feet, and judgment was rendered for the difference between the contract price and such market value. The findings contain other details, including a modification of the contract as to price by which it was reduced from $28.50 to $27.50 per thousand feet. But they are all set forth in the statement of facts, and in this connection the substance only of the controlling findings are presented; they show, as we have seen, the making of a contract, its breach, and the damage to the plaintiff, measured by the difference between the contract price and the market value at the time and place of delivery. The only opportunity for legal controversy involved in this statement relates to the measure of damages, *i. e.*, whether the referee was right in holding that the plaintiff was entitled to recover the difference between the contract price and the market value at the time and place of delivery. That such is the general rule both in England and in this country, is beyond question, and in this state the rule has been not only recognized but asserted on a number of occasions by the courts. In *Todd* v. *Gamble* (148 N. Y. 382) this court said: "The general rule for the measure of damages, in the case of a breach by a vendee in the contract for the sale of an article of merchandise at a fixed price, is the difference between the contract price and the market value of the article on the day and at the place of delivery;" citing *Gregory* v. *McDowel* (8 Wend. 435); *Dey* v. *Dox* (9 Wend. 129); *Windmuller* v. *Pope* (107 N. Y. 674); Wood's Mayne on Damages (§ 200). The principle upon which it rests is that of an indemnification of the injured party for the injury which he has sustained, and, in ordinary cases, the value in the market on the day forms the readiest and most direct method of ascertaining the measure of this indemnity. If the article is bought and sold in the market, the market price shows what pecuniary sum it

48

would take to put the plaintiff in as good a position as if the contract had been performed. (Sedgwick on Damages, §§ 243, 244.) But when there is no such standard, the damages must be estimated from other means of valuation. In *Parsons* v. *Sutton* (66 N. Y. 92) the court laid down the general rule that "The ordinary rule of damage in such case is, as already stated, the difference between the contract price and the market price at the time and place of delivery. * * * But this is not the only measure of damage to be applied where the buyer sues the seller for a breach of contract of sale. The buyer may have suffered special damage by the breach, which is of such a character that under the rules of law he is entitled to recover it." That was a case where the plaintiff claimed that the paper the defendant had promised to furnish him was to be used as the frontispiece for the July number of the Aldine. Paper of the kind and character of that ordered was not to be found in the market, and, therefore, the plaintiff was caused to suffer injury to its reputation and in subscriptions, in that it could not carry out the promise given to the public. The evidence did not show that similar paper was not to be found in the market, or that paper of the same quality could not have been obtained from other dealers. All the defendants did was to go to dealers and try to buy paper like that which the defendants were to deliver. It did not appear that they could not have found paper which would have substantially answered the purpose. It was with reference to that general situation that the court, after asserting that special damages may be allowed when the general rule will not furnish a full indemnification, said: "There is another pertinent rule of damages, that the party who suffers from a breach of contract must so act as to make his damages as small as he reasonably can." A just rule, indeed, and applied wherever needful, but one wholly without practical application to a case where the subject-matter of the contract has a market value at the time and place of delivery. Very rarely, indeed, can there come a case where the vendee suffers special damages if, at the time and place of delivery, there was a mar-

ket value for the article purchased by him. A market value at a given place presupposes that merchandise of that character was at that time and place sold or offered for sale, and thus the opportunity is presented the vendee of buying the article in the open market to be used for the special purpose intended, and of recovering of the defendant the difference between such market value and the contract price. But he cannot neglect to buy when he has the opportunity in the market and then charge the defendant with the special damages resulting. Nor does the law require him to buy in order to secure the damages actually sustained by a breach of the contract. It would not advantage the defaulting party if he should do so ; for, if he buys at the market value, the result to the other party is the same as if he simply proved the market value. So this general rule of damages has in practical effect come to be the only rule ; as the court said in *Parsons* v. *Sutton* (*supra*) : " When the buyer can go into market and buy the article which the seller has failed to deliver, this is the only rule, as it offers the buyer full indemnity." Turning to the findings of the referee we read that the defendant stated to the plaintiff on " Oct. 2nd, 1890, that the lumber it was then delivering to the plaintiff under the contract shows an average value of $32.50 per thousand feet," and " that in fact the market value of the lumber which the defendant agreed to deliver to the plaintiff under the contract was at Tonawanda in the fall of 1890 $32.50 per thousand feet."

This brings us to the exceptions taken to the refusal of the referee to permit Crane, who was an officer and a large owner in the defendant and also half owner of A. M. Dodge & Company, to answer certain questions. Before quoting the questions it should be said that the witness had already testified that A. M. Dodge & Company had yards at Tonawanda and occupied offices jointly with this defendant; that the same clerical force did the work for each, and that they had for sale during that period of time what was known as Grand Haven pine, which the witness had described and characterized as

fully as good, if not better, than the lumber of the Penokee
Company.    Then this question was put to him: "Q. This
1,208,000 feet of Grand Haven pine, which you testified was
in the possession of A. M. Dodge and Company in its yards
at Tonawanda, on or about November 6, 1890, would you
have sold that amount of pine to the plaintiff in this action
at the prices mentioned in the contract in suit?"    There are
several objections to this question, but a statement of two of
them will suffice to show that the referee did not err in his
ruling.    In the first place the question did not call for a fact,
but instead for a mere operation of the witness' mind, the
secret undisclosed intent of the witness in the event of the
presentation of a situation calling for action.    It did not
inquire of Crane whether he had tendered that quantity of
pine lumber to the plaintiff at the same rate as the contract
called for, or that he offered it to him, but it sought merely
to elicit from him his secret mental operation, which was safely
beyond contradiction.    Such evidence is not admissible.    (*New-
ell* v. *Doty*, 33 N. Y. 83–84; *Waugh* v. *Fielding*, 48 N. Y.
681; *People* v. *Sharp*, 107 N. Y. 427–462.)    Again, the
question was not what was the market value of lumber of the
size and quality that the plaintiff was entitled to under this
contract.    It is not pretended that it did not have a market
value.    The referee finds that it did have it at Tonawanda,
the place of delivery, at the time the delivery was to be made.
That finding is quite sufficient to govern our action, without
looking into the record to see whether or not there was evi-
dence of market value.    But if we should, we would find that
lumber of this character, and of these sizes, was sold in the
open market in November, 1890, and that it had a market
value.    As this question was not directed to proof of market
value, which always means in open market where any one can
come and buy, but to what the plaintiff might have done had
the opportunity been presented him, it does not prove or tend
to prove the market value of lumber. ,

The other question was: "Q. You have sold in open
market at Tonawanda, this 1,208,000 feet of Grand Haven

stock in the month of November, 1890 ? " Had there been
added to the question " at $28.50 per thousand feet," or any
other sum under $32.50 per thousand feet, the question would
have been material and relevant. One of the most important
of the issues was the market value of the lumber in November,
1890, and the defendant would have been entitled to prove
this or any other sale as bearing upon that issue. But an
answer to the question would have furnished no assistance
whatever if it had been in the affirmative. The presumption
still would have been that the sale was at the market rate,
which witnesses who testified said was $32.50 per thousand
feet. To the suggestion that the learned Appellate Division
may well have treated this question as but an introductory one
to the general subject, and, therefore, not to be treated in any
narrow spirit, the answer seems to be that the referee's atten-
tion was not drawn to the fact, if it was a fact, that the
defendant asked this question for the purpose of showing
market value. No evidence apparently having a bearing on
that subject was excluded by him, and this question followed
next after the one already considered 'in this opinion and
which called for a statement from the witness as to what he
would have done had the plaintiff been willing to take the
Grand Haven lumber. It was a question based apparently upon
the theory entertained by the defendant, that the plaintiff was
obliged to look about for lumber to take the place of that
which it had refused to deliver to him, instead of relying
upon the market value of the lumber at the time and place of
delivery as and for his indemnity. The referee was, there-
fore, not advised by the connection in which the question was
asked, any more than he was by the form of the question,
that the purpose of the counsel in asking it was the introduc-
tion of evidence tending to show the market value of the
lumber that was the subject of the contract. If the defend-
ant had in any way pointed out that this evidence was but an
entering wedge towards establishing market value at a lower
rate than that proved by plaintiff's witnesses, the reversal
might be justified, but that was not the situation. The referee

was not apprised that such was the purpose of the testimony, and, therefore, we must treat it precisely as if an affirmative answer to that question had been given, and nothing more, that is, that he had sold in open market at Tonawanda this one million two hundred and eight thousand feet of Grand Haven lumber in stock in the month of November, 1890. With that evidence in the case the referee would have had no assistance from it whatever, as the presumption as to price would be that it was sold at the market price as testified to by several witnesses, which was not less than $32.50 per thousand feet.

We are unable to agree with the Appellate Division that the referee erred in his rulings upon the two questions considered.

The order, therefore, should be reversed, and the judgment entered upon the report of the referee affirmed, with costs.

All concur, except O'BRIEN and HAIGHT, JJ., not voting.

Order reversed, etc.